IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LACI N. BLANCHARD, Individually and as next friend of W.B., Surviving Minor Child of RONNIE P. BLANCHARD, JR.<br><br>*Plaintiff,*<br><br>v.<br><br>SANARE ENERGY PARTNERS, LLC, et al.,<br><br>*Defendants*. | § § § § § § § § § § § § § | Civil Action No. 4:22-cv-2420 |

## PLAINTIFF'S MOTION TO EXCLUDE
## OPINIONS AND TESTIMONY OF DR. KEITH VAN METER

Plaintiff Laci N. Blanchard hereby moves this Court for an order excluding the opinions and testimony of Dr. Keith Van Meter from the upcoming trial. Dr. Van Meter is set to offer opinions about Mr. Blanchard's fall and death, including that Mr. Blanchard struck his head before hitting the water and that he was unconscious before he drowned. No evidence supports these opinions. Thus, the opinions have no basis in fact and should be excluded.

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ II

TABLE OF AUTHORITIES ......................................................................................... III

INTRODUCTION ............................................................................................................ 1

STAGE AND NATURE OF THE PROCEEDING ........................................................ 2

STATEMENT OF FACTS .............................................................................................. 2

STATEMENT OF THE ISSUES .................................................................................. 10

SUMMARY OF THE ARGUMENT ............................................................................ 10

ARGUMENT .................................................................................................................. 11

A.    Unsupported expert opinions should be excluded. ........................................... 12

B.    Dr. Van Meter has not provided any factual basis for his opinions. ................ 13

CONCLUSION .............................................................................................................. 14

CERTIFICATION OF SERVICE ................................................................................ 16

ii

# TABLE OF AUTHORITIES

**CASES**

*Coleman v. BP Expl. & Prod., Inc.*,
  No. CV 17-4158, 2022 WL 2314400 (E.D. La. June 28, 2022) .................................. 11

*Hathaway v. Bazany*,
  507 F.3d 312 (5th Cir. 2007) ...................................................................................... 13

*Loy v. Rehab Synergies, LLC*,
  558 F. Supp. 3d 402 (S.D. Tex. 2021) ................................................................... 11, 12

*Mathis v. Exxon Corp.*,
  302 F.3d 448 (5th Cir. 2002) ...................................................................................... 10

*Omni USA, Inc. v. Parker-Hannifin Corp.*,
  964 F. Supp. 2d 805 (S.D. Tex. 2013) ........................................................................ 11

*Stallion Heavy Haulers, LP v. Lincoln Gen. Ins. Co.*,
  No. SA-09-CA-0317-FB, 2011 WL 130154 (W.D. Tex. Jan. 13, 2011) ...................... 10

*United States v. 4.620 Acres of Land, more or less, in Hidalgo Cnty., Tex.*,
  576 F. Supp. 3d 467 (S.D. Tex. 2021) ........................................................................ 12

**RULES**

FED. R. EVID. 702 ............................................................................................................. 10

## INTRODUCTION

On March 25, 2022, about 8:30 in the morning, Ronnie Blanchard was working on a hydraulic workover unit attached to a wellhead in the Gulf. Mr. Blanchard was tied off near the top of the 130-foot structure by his fall protection harness, as required by SBS policy. Mr. Blanchard unhooked the crane being used to support the unit, when suddenly, without warning, the structure began to sway. Before Mr. Blanchard could react, the unit tipped over into the 30-foot-deep water, dragging Mr. Blanchard with it. Several witnesses saw the equipment fall. Some even testified that they made eye contact with Mr. Blanchard as he was being pulled towards the water.

SBS Energy, Mr. Blanchard's employer, has designated several experts to testify to various issues in the case. One of those witnesses, Dr. Keith Van Meter, has been designated to testify to certain medical issues in the case. Dr. Van Meter is board-certified in Emergency Medicine, Undersea and Hyperbaric Medicine, Pediatric Emergency Medicine, and Medical Toxicology. He will purportedly testify that "Mr. Blanchard suffered only a brief moment of fright and consciousness before his death because he was knocked unconscious before he fell into the water and subsequently drowned." Ex. 1: SBS Expert Designations, at 3. In support of his opinions, Dr. Van Meter issued a two-page report. *See* Ex. 2: Dr. Van Meter Report. The problem with Dr. Van Meter's opinions is that he has no factual basis for his conclusions. His report is barren of any references to the actual evidence in this case, which makes sense because there is no evidence in the record that Mr. Blanchard hit his head before he hit the water, or that he lost consciousness. Thus, Dr. Van Meter's opinions do not pass muster under the Federal Rules. Under the Rules,

expert testimony must be based on sufficient facts. Dr. Van Meter's opinions are not based on any, let alone sufficient facts. Accordingly, Plaintiff asks the Court to exclude Dr. Van Meter from testifying at trial.

## STAGE AND NATURE OF THE PROCEEDING

This wrongful death case is about Ronnie Blanchard, a Jones Act seaman who drowned off the coast of Louisiana while working for Defendant SBS Energy Services. This pretrial motion to exclude deals with the opinions and testimony of one of SBS Energy's medical experts, Dr. Keith Van Meter. Dr. Van Meter's medical opinions about Mr. Blanchard's death are devoid of a sufficient factual basis and should be excluded.

## STATEMENT OF FACTS[1]

Decedent Ronnie Blanchard was killed when a hydraulic workover unit he was tied to tipped over and fell into the Gulf off the coast of Louisiana. *See* Dkt. 128 at 3.

---

[1] For a more detailed recitation of the facts, *see* Plaintiff's response to SBS Energy's motion for summary judgment. Dkt. 128. Citations to the general facts are made to that response and the corresponding exhibits, which Plaintiff incorporates here by reference.

2



*Figure 3: HWU Makeup Process by Day*



*Figure 4: HWU After Falling into the GOM*

The incident occurred several days into a "rig-up" job on a wellhead. *Id.* at 5. Mr. Blanchard was tied to the HWU near the top, approximately 100 feet in the air by his fall protection harness. *Id.* at 6. Around 8:30 a.m. on the morning of March 25, 2022, Mr. Blanchard unshackled the crane from the top of the jack. *Id.* at 6. Once the crane line was

3

unhooked, the 130,000-pound unit began to sway before tipping over. *Id.* Mr. Blanchard was sucked into the water with the unit and could not save himself. *Id.*

SBS was responsible to perform a field test, inspect the casing, and follow up with additional testing of the wellhead as needed. *Id.* at 9. SBS performed a field survey, but there is no evidence it conducted anything more than a visual inspection of the wellhead. *Id.* But even a visual inspection should have alerted SBS to the condition of the wellhead and the fact that it could not hold the entire weight of the HWU. *Id.* at 10. After the incident, it was discovered that the failure point was just above the water line. *Id.* at 11. The casing was so corroded that the incident was inevitable. *Id.* at 12. Evidence shows that SBS knew that the conditions were dangerous and that the wellhead would likely not support the weight of the equipment, yet it chose to go forward with the project. As a result, Mr. Blanchard was killed. *Id.* at 14.

On June 17, 2025, SBS Energy served its expert designations. In an effort to minimize Mr. Blanchard's suffering, SBS Energy designated Dr. Keith W. Van Meter to testify that Mr. Blanchard experienced only momentary fright and lost consciousness early into the ordeal. The entire designation has been reproduced below:

> **Keith W. Van Meter, MD**
> 2000 Canal Street, Suite 2720
> New Orleans, LA 70112
>
> Dr. Keith W. Van Meter is board-certified in Emergency Medicine, Undersea and Hyperbaric Medicine, Pediatric Emergency Medicine, and Medical Toxicology and his current title is Chief, LSU Section of Emergency Medicine. He will testify consistent with his report, that Mr. Blanchard suffered only a brief moment of fright and consciousness before his death because he was knocked unconscious before he fell into the water and subsequently drowned.

4

Ex. 1: SBS Expert Designations, at 3.

    Dr. Van Meter also provided a two-page expert report where he concludes that:

> In my opinion sometime during the fall he had a severe head and body strike against steel of the HWO and at that time most probably lost consciousness, then accompanying AC water drowning. Minimally he would have experienced fright in the initial start of the fall before the head and body strike.
>
> . . .
>
> As a corollary, had Ronny Blanchard been in a hypothetical motor vehicle accident, having had the same instantaneous injuries, he would have had instant fright immediately followed by loss of consciousness. Had the car then gone into the water in this hypothetical case, he would have been unaware of drowning, even if he was momentarily breathing.

Ex. 2: Dr. Van Meter Report, at 2.

    Dr. Van Meter offers no evidence in support of these opinions. And in fact, the opinions are contradicted by the testimony in the record.

    Several witnesses described the incident and testified that they either saw the equipment fall, saw Mr. Blanchard, or both. The most complete eye-witness testimony of the incident comes from Houston James Londo, the crane operator. He explained that he saw both the equipment and Mr. Blanchard fall. He testified that Mr. Blanchard did not hit his head on the rig.

> Q. Okay. You saw that happen, didn't you?
> A. Yeah, I seen it. Yeah.
> Q. Okay. Did you see the individual fall into the water?
> A. Yes, sir.
> Q. Okay. Well, he was alive when he was on top of that tower, wasn't he?

> A. Yes, sir.
>
> Q. And he never came up, did he?
>
> A. No, sir.
>
> Q. Did you see him hit his head on anything or do you see him crashing into anything?
>
> A. No. It just happened so fast.
>
> Q. Okay.
>
> A. Blink of a eye.
>
> Q. But you -- you had full visual contact with Mr. Blanchard as the tower fell over and he went into the water, didn't you?
>
> A. Yes, sir.
>
> * * *
>
> Q. Okay. And -- and to be clear, you had eye visual contact, radio contact with Mr. Blanchard before he fell and saw him fall into the water, correct?
>
> A. Yes, sir.
>
> Q. All right. Could you see that he was tied off to the tower?
>
> A. Yeah. He still was tied off.
>
> Q. Okay. Did you hear him yell or scream or anything? Could you hear that?
>
> A. No, I couldn't hear nothing in the crane.

<u>Ex. 3: Londo Dep., at 60:12-61:5; 63:20-64:5</u>.

Michael Granger, VP of operations for Sanare, noted that not a single witness saw Mr. Blanchard hit his head. On the contrary, the evidence shows that Mr. Blanchard was alive when he hit the water and that the other workers were hoping that he'd be able to free himself and swim to the surface.

> Q. Right. So every single person who had witnessed this topple over were hoping and praying that Ronnie would be able to get himself disconnected and be able to swim back up, right?
>
> A. Yes, sir.

6

> Q. And no one you talked to at all had said that Ronnie, you know, had been killed or crushed or anything like that before he went in the water. You didn't hear any evidence of that, correct?
>
> A. No, sir.
>
> Q. All right. The evidence was all, he went in the water alive, and they were hoping he could make it out?
>
> A. Yes, sir.
>
> Q. Okay. And unfortunately, that -- he wasn't able to get it disconnected, correct?
>
> A. That's correct.
>
> * * *
>
> Q. And this is the part that it sounds like from all the witness statements, witnesses saw Mr. Blanchard fall into the water while he was still connected to the hydraulic workover unit.
>
>     Is that correct?
>
> A. Yes, sir.
>
> Q. And so, it wasn't that the witnesses were concerned that he had already passed away. Their hope was he's down there, pinned in the water, and hopefully he can disconnect himself and get out, correct?
>
> A. Yes, sir.

Ex. 4: Granger Dep., at 130:8-24; 185:19-186:5.

Others, like Captain Liberstat and SBS Energy worker Lance Rodrigue, did not see the incident. *See* Ex. 5: Liberstat Dep., at 73:13-15; Ex. 6: Rodrigue Dep., at 15:5-9. Some, like company man Percy Lormand saw the incident but did not have a good view of Mr. Blanchard. *See* Ex. 7: Lormand Dep., at 74:18-76:9 ("Q. . . . So you didn't actually see it hit the water -- A. No. Q. -- you just saw it falling? A. Right[.] . . .").

7

In his deposition, Kelvin Brereton stated that no one would be able to testify as to whether Mr. Blanchard was conscious or not when he hit the water or whether he hit his head.

> Q. I see. So there were no SBS crew members or anybody else that was in a position to be able to actually see the moment that the hydraulic work-over unit went into the water?
>
> A. No.
>
> Q. And so if nobody saw the hydraulic work-over unit go into the water, no one that was physically present on the lift boat for this project is going to be able to say whether or not Mr. Blanchard was conscious, unconscious, screaming, not screaming as the hydraulic work-over unit went into the water; would you agree?
>
> A. When that beam hit the front of the lift boat, I saw Mr. Blanchard slingshot around the legs. That's why I said his head hit the jack leg.
>
> Q. And, Mr. Brereton, I'm not quibbling with you, right? I just -- when I talked to you earlier, it sounded like it was kind of the gash that was on his head --
>
> A. Yes.
>
> Q. -- that led you to the belief that he was unconscious, right?
>
> A. Yeah.
>
> Q. But you didn't actually see him go into the water, agreed?
>
> A. No.
>
> Q. Nobody on this project actually saw him go into the water?
>
> A. No.
>
> Q. And so as far as someone actually observing whether or not Mr. Blanchard was conscious or unconscious at the time that this hydraulic work-over unit went underwater, no one is going to be able to say I personally observed that his eyes were closed or that his eyes were open.
>
> A. Correct.

<u>Ex. 8: Brereton Dep., at 253:11-254:22</u>.

Matthew Gaudet offered similar testimony, i.e., he made eye contact with Mr. Blanchard but did not see him enter the water. In other words, he also did not offer evidence that Mr. Blanchard either hit his head or was unconscious:

> Q. And when Ronnie unhooks the crane, can you tell me what you saw happen next?
>
> A. Well, he unhooked one shackle on the spreader bar. He bent down and hooked the other shackle on the spreader bar. He stood up and looked at me like he will say something, and then it fell over, like, seconds after he unhooked it.
>
> Q. And you mentioned that kind of right before it fell over, you actually made eye contact with Ronnie?
>
> A. Yeah, he was looking right at me. I had the next piece of equipment to hook up.
>
> Q. And so -- and I know this is hard, Mr. Gaudet. But you actually watched the hydraulic workover unit tip over and fall into the water?
>
> A. That's correct. It fell and one of the arms hit the front of the barge, and then it went straight down.
>
> Q. Could you hear -- and I have to ask these questions, Mr. Gaudet. I don't like making you relive this, but new question, new line. Did you hear Mr. Blanchard screaming or yelling for help at all?
>
> A. It was very fast.
>
> Q. It was? Okay. Did you see Mr. Blanchard actually go into the water?
>
> A. No, I couldn't see. I was too far from the edge.
>
> Q. I got it. So at some point, the --
>
> A. I lost eye contact.

Ex. 9: Gaudet Dep., at 55:22-57:1.

In his statement to the labor board, Mr. Gaudet explained that he saw the shock on Mr. Blanchard's face as the unit fell, but again, did not testify that Mr. Blanchard hit his head or lost consciousness. *Id.* at 119:11-120:10 ("Q. What emotions did you see on Mr.

9

Blanchard's face as the hydraulic workover unit was falling, sir? A. Shock. His eyes just opened up. It -- it's hard. It happened real fast.").

## STATEMENT OF THE ISSUES

Should the Court exclude the testimony of Dr. Keith Van Meter who intends to testify that Mr. Blanchard hit his head and lost consciousness before he hit the water where no evidence suggests either is the case?

***Suggested Answer***: Yes.

## SUMMARY OF THE ARGUMENT

To be admissible, expert testimony must be reliable, relevant, and based on a sufficient factual basis. Here, SBS Energy has designated Dr. Keith Van Meter to testify about the medical issues surrounding Mr. Blanchard's death. Dr. Van Meter plans to testify that Mr. Blanchard hit his head as the equipment he was tied to fell, before losing consciousness. There is one problem: no evidence supports Dr. Van Meter's theory. Multiple witnesses testified that Mr. Blanchard was alive when the equipment fell. Some even had eye contact with him and saw the shock on his face. But not a single witness testified that Mr. Blanchard hit his head or lost consciousness before he entered the water. As a result, there is no evidence to support Dr. Van Meter's opinions.

Courts in the Fifth Circuit routinely exclude expert testimony when that testimony is not based on sufficient facts or evidence. Indeed, testimony that is devoid of a factual basis is unreliable and unhelpful to the jury. Accordingly, Dr. Van Meter's opinions should be excluded.

## **ARGUMENT**

For an expert to testify in the form of an opinion, the testimony must satisfy four independent requirements: it must (1) be based on "sufficient facts or data," result from (2) "reliable principles and methods," and (3) reliable application of those "principles and methods to the facts of the case," and (4) "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. "The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the rule 702 test." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

Importantly, "the court has discretion to exclude expert testimony that is unhelpful to the [trier of fact]." *Stallion Heavy Haulers, LP v. Lincoln Gen. Ins. Co.*, No. SA-09-CA-0317-FB, 2011 WL 130154, at *1 (W.D. Tex. Jan. 13, 2011) (alterations as in original). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Coleman v. BP Expl. & Prod., Inc.*, No. CV 17-4158, 2022 WL 2314400, at *3 (E.D. La. June 28, 2022).

Dr. Van Meter has been designated to offer medical opinions about Mr. Blanchard's death. His ultimate opinion is that during his fall, Mr. Blanchard struck his head and lost consciousness before he entered the water and drowned. *See* Ex. 2: Van Meter Report, at 2. But there is no evidence to back up this testimony. Indeed, not a single eyewitness testified that Mr. Blanchard hit his head before he entered the water, or that he was unconscious before he drowned. In short, the opinions do not have a reliable factual basis. As a result, the opinions are not helpful, are speculative and unreliable, and should be excluded.

A.      **Unsupported expert opinions should be excluded.**

For expert opinions to be admissible, they must have a factual basis. *See Loy v. Rehab Synergies, LLC*, 558 F. Supp. 3d 402, 408 (S.D. Tex. 2021) ("Under the first element, 'the existence of sufficient facts . . . is in all instances mandatory.'"); *Omni USA, Inc. v. Parker-Hannifin Corp.*, 964 F. Supp. 2d 805, 836 (S.D. Tex. 2013) ("Federal Rule of Evidence 702 allows a witness 'qualified as an expert by knowledge, skill, experience, training or education' to offer opinion testimony if that testimony will assist the trier of fact, if 'the testimony is based on sufficient facts or data,' if it 'is the product of reliable principles and methods,' and if 'the expert has reliably applied the principles and methods of the facts of the case.'").

"Unsubstantiated factual assertions will bar expert testimony, as will 'altered facts and speculation designed to bolster [the proponent's] position.'" *United States v. 4.620 Acres of Land, more or less, in Hidalgo Cnty., Tex.*, 576 F. Supp. 3d 467, 475 (S.D. Tex. 2021).

District courts have broad discretion to assess whether the evidence the expert relied on "is sufficient to support the expert's opinion." *Loy*, 558 F. Supp. 3d, at 408 (internal citations and quotations omitted).

Although as a general rule, cross-examination is the preferred means to challenge the factual bases of an expert's opinions, opinions "based on 'insufficient, erroneous information,' fail[] the reliability standard" and should be excluded. *Id.* at 409.

**B.      Dr. Van Meter has not provided any factual basis for his opinions.**

Here, Dr. Van Meter has not provided a sufficient factual basis for his opinions that Mr. Blanchard struck his head before he hit the water and drowned. Dr. Van Meter also claims that Mr. Blanchard was likely unconscious before he hit the water. But Dr. Van Meter provides no evidence to support these conclusions. Nor could he, because the testimony from the various witnesses cuts directly against the doctor's opinions.

Mr. Londo was the only witness who testified that he had "full visual contact with Mr. Blanchard as the tower fell and he went into the water[.]" Ex. 3: Londo Dep., at 61:2-5. He did not see Mr. Blanchard hit his head. *See id.* at 60:22-24 ("Q. Did you see him hit his head on anything or do you see him crashing into anything? A. No. It just happened so fast."). Other witnesses saw Mr. Blanchard as the HWU fell, but none of them saw him hit his head or lose consciousness. *See*, *e.g.*, Ex. 9: Gaudet Dep., at 56:17-24 ("Q. . . . Did you hear Mr. Blanchard screaming or yelling for help at all? A. It was very fast. Q. It was? Okay. Did you see Mr. Blanchard actually go into the water? A. No, I couldn't see. I was too far from the edge.").

Mr. Gaudet testified that he saw the shock on Mr. Blanchard's face. *See* Ex. 9: Gaudet Dep., at 120:7-10 ("Q. What emotions did you see on Mr. Blanchard's face as the hydraulic workover unit was falling, sir? A. Shock. His eyes just opened up. It -- it's hard. It happened real fast."). But again, no one was saying that Mr. Blanchard had been killed, crushed, or struck before he hit the water. *See* Ex. 4: Granger Dep., at 130:13-21 ("Q. And no one you talked to at all had said that Ronnie, you know, had been killed or crushed or anything like that before he went in the water. You didn't hear any evidence of that,

13

correct? A. No, sir. Q. All right. The evidence was all, he went in the water alive, and they were hoping he could make it out? A. Yes, sir.").

Based on the lack of evidence in the record to support Dr. Van Meter's opinions, the conclusions he makes are baseless and should be excluded. Courts routinely reject expert opinions like Dr. Van Meter's. Indeed, "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (cleaned up). Dr. Van Meter should not be allowed to testify at trial because he cannot point to a single fact in the record that supports his opinions. The Court should exclude his testimony.

## CONCLUSION

The Court should grant Plaintiff's motion to exclude.

Respectfully submitted,

**ARNOLD & ITKIN LLP**

*/s/ Roland Christensen*
Kurt Arnold
SBN: 24036150
karnold@arnolditkin.com
Caj Boatright
SBN: 24036237
cboatright@arnolditkin.com
Roland Christensen
SBN: 24101222
rchristensen@arnolditkin.com
Adam Lewis
SBN: 24094099
alewis@arnolditkin.com
6009 Memorial Drive
Houston, TX 77007

14

        Tel: 713.222.3800
        Fax: 713.222.3850
        e-service@arnolditkin.com
        rolandteam@arnolditkin.com

- and -

**DRENNAN LANGDON & FIDEL, LLP**

Joe Drennan
SBN: 24080652
joe@dlflawfirm.com
Wendell H. Langdon, III
SBN: 24080116
wlangdon@dlflawfirm.com
1001 Main Street, Suite 706
Lubbock, TX 79401

**ATTORNEYS FOR PLAINTIFFS**

15

## **C**ERTIFICATION OF **S**ERVICE

A true and correct copy of the foregoing has been forwarded to the following counsel of record on this the 1st day of August 2025.

<div style="text-align:right">

*/s/ Roland Christensen*
Roland Christensen

</div>